390 So.2d 913 (1980)
UNITED GAS PIPE LINE COMPANY, Plaintiff-Appellant,
v.
Arvis E. WHITMAN, Sheriff and Ex-Officio Tax Collector, Bienville Parish, Louisiana, Defendant-Appellee, two cases.
Nos. 14284, 14285.
Court of Appeal of Louisiana, Second Circuit.
October 28, 1980.
Rehearing Denied December 8, 1980.
*915 Hargrove, Guyton, Ramey & Barlow by Michael R. Mangham and Malcolm S. Murchison, Shreveport, for plaintiff-appellant United Gas Pipe Line.
McCollister, McCleary, Fazio, Mixon & Holliday by D. Irvin Couvillion and Neil H. Mixon, Jr., Baton Rouge, Whitten & Blake by Leon H. Whitten, Jonesboro, for defendant-appellee Arvis E. Whitman.
Before PRICE, MARVIN and JASPER E. JONES, Jr., JJ.
En Banc. Rehearing Denied December 8, 1980.
PRICE, Judge.
Plaintiff, United Gas Pipe Line Company (United), appeals from a judgment of the district court which rejected its demands for the return of ad valorem taxes paid under protest to the sheriff and tax collector for Bienville Parish. The judgment also ordered United to pay defendant's attorney fees. For the reasons discussed below we affirm the judgment rejecting the demand for recovery of the taxes and reverse the judgment ordering plaintiff to pay attorney fees.
In connection with its operation of an interstate natural gas pipe line, United owns and operates an underground storage facility for natural gas in Bienville Parish, Louisiana, known as the Bistineau Storage Project (hereinafter referred to as the Project). The Project and the pipe line system are operated pursuant to certificates of public convenience and necessity issued by the Federal Power Commission, now succeeded by the Federal Energy Regulatory Commission (FERC). The Project includes a large underground geological formation which was formerly a producing natural gas field. After most of the recoverable gas had been produced from the field, United began converting it into a storage reservoir in 1966.
There are three categories of natural gas present in the reservoir. "Native" gas is that which was not recovered when the gas field was producing. The volume of native gas present in the reservoir is a constant and is not at issue in this case. The second category consists of gas which is injected into the reservoir to establish the base pressure required for the Project's operation. This is referred to as "cushion" gas. A final category is the "working" gas or the gas which is stored for varying periods of time in the reservoir pending its further transportation and delivery to customers. The term "gas in storage" refers collectively to the cushion and working gas.
The Project's operation is divided into cyclical periods or "seasons." Working gas is purchased from producers in the field and transported via United's pipe line to the Project where it is injected into the reservoir during the "injection" season of April through October of each calendar year. The gas is stored at the Project until the "withdrawal season" (consisting of the months of January through March and November through December) when it is withdrawn and transported to United's customers. The protested taxes at issue were based on the assessed value of the gas in storage present in the reservoir during tax years 1977 and 1978.
In September of 1977 United received tax notices from the defendant-tax collector for ad valorem taxes based on the assessed value of both the fixed assets and the gas in storage belonging to United in Bienville Parish. United paid the taxes but protested the amount attributable to the gas in storage and gave written notice of its intention to file suit for the recovery of the protested taxes pursuant to La.R.S. 47:2110. In January of 1978 United filed suit for the recovery of the protested 1977 taxes. In September of 1978 United received tax notices from defendant for ad valorem taxes based on the value of its property in Bienville Parish. Again a portion of these taxes was based on the assessed value of the gas in storage at the Project. This portion of the 1978 ad valorem taxes was paid under protest and suit for recovery was filed in January of 1979. The total amount of ad valorem taxes assessed on and attributable to United's gas stored at the Project was *916 $294,488.45 for tax year 1977, and $412,106.49 for tax year 1978. By joint motion of the parties, recovery of both years' protested taxes based on the assessed value of the gas in storage is included within the scope of this litigation.
United contends that the imposition of ad valorem taxes on the gas in storage violates the commerce clause of the United States Constitution and Article VII § 21(D)(3) of the Louisiana Constitution. United further contends that Louisiana severance tax has already been paid on a portion of the gas in storage which was produced in Louisiana, and that this gas is thus exempt from further taxation under La.Const. Art. VII § 4(B).
The issues on appeal are:
(1) Whether the ad valorem taxes assessed on United's gas in storage at the Project in Bienville Parish are prohibited by the commerce clause;
(2) Whether United's gas in storage is exempt from ad valorem taxation under La.Const. Art. VII § 21(D)(3);
(3) Whether the gas in storage upon which Louisiana severance tax has been paid is exempt from ad valorem taxation under La.Const. Art. VII § 4(B); and
(4) Whether a taxpayer who pays ad valorem taxes under protest and unsuccessfully seeks recovery under La.R.S. 47:2110 is liable for attorney fees of 10% of the amount of taxes paid as provided by La.R.S. 47:1998.
COMMERCE CLAUSE
United contends that the ad valorem taxes assessed on the working gas stored at the Project are prohibited by the Federal Constitution, Article I, § 8 as this gas is in transit in interstate commerce. Approximately 97% of the working gas injected into the Project in 1976 and 100% of the working gas injected during 1977 was produced outside of Louisiana and transported by pipe line to the Project for storage pending its ultimate withdrawal and delivery to out-of-state consumers.
The commerce clause prohibits taxation by the states of property which is in transit in interstate commerce. However, by reason of a break or interruption in the interstate transit, the property may be deemed to have come to rest within a state and become subject to the power of the state to impose a non-discriminatory property tax. The crucial question to be settled in determining whether property moving in interstate commerce is subject to local taxation is that of its "continuity of transit." Carson Petroleum Co. v. Vial, 279 U.S. 95, 101, 49 S.Ct. 292, 293, 73 L.Ed. 626, 629 (1929).
The general rule is that the interstate transit is continuous and the property is not subject to local taxation where the storage or delay is due to transportation, safety, or natural cause reasons. This immunity from local taxation is lost where the interruption is due to an intentional detention for the beneficial and business purposes and convenience of the owner. Enterprise Products Co. v. Whitman, 364 So.2d 634 (La.App. 2d Cir. 1978) writ denied 366 So.2d 916 (La.1979). "The question is always one of substance, and in each case it is necessary to consider the particular occasion or purpose of the interruption during which the tax is sought to be levied." Independent Warehouses v. Scheele, 331 U.S. 70, 73, 67 S.Ct. 1062, 1065, 91 L.Ed. 1346, 1353 (1947).
The resolution of the present case requires the application of these well settled legal principles to the facts before us to determine the reason or purpose behind United's decision to place the natural gas in storage in Bienville Parish.
Prior to the construction of the Project, United had entered into long term purchase contracts with producers of natural gas. Under the terms of these purchase agreements, United was committed to buy a certain volume of gas during the period covered by the contract. At this time (the early to mid 1960's) the supply of natural gas exceeded the demand and United found itself in a situation where it had no buyers for all of the gas it was committed to buy *917 and insufficient facilities in which to store the excess gas. The alternatives available to United to alleviate this "take or pay situation" were either to build a storage facility for the gas not immediately marketable or build extensive new pipe line systems to handle the excess. The latter alternative was not feasible economically so United applied to the Federal Power Commission for permission to build the Bistineau Storage Project. As shown by the deposition of Evans H. Lamar, United's general superintendent of gas control, the original purpose of United in utilizing the storage reservoir was to get out of this "take or pay" situation. By utilizing the storage facilities United was able to purchase gas during periods of lowest demand and transport the gas to the Project where it was stored until the winter months of peak demand.
It is apparent that the initial purpose of United in building the Project was to respond to market conditions as they existed at the time, i. e., a purely economic decision made by United to enable it to operate its pipe line system most effectively. united contends however, that changing market conditions and increased governmental regulation now make the storage of gas in the Project mandatory and beyond its control. At all times applicable to the present case the demand for natural gas exceeded the available supply (on a yearly average). This shortage of natural gas nationwide has required the Federal Energy Regulatory Commission to closely regulate the pricing of natural gas and to set curtailment schedules designating priority consumers during times of shortage. State conservation programs also have an effect on the availability of supply during peak demand. United contends that all of these factors in combination require that the gas purchased by it in excess of demand during the summer months be stored so that its priority customers (as set by the curtailment program) will receive their quota of gas during the winter. United therefore contends this governmental regulation of its pipe line system makes the storage of gas in Bienville Parish an "exigency of the chosen means of transportation," and therefore the interstate transit of the gas purchased outside Louisiana and stored in transit pending its ultimate delivery to customers outside Louisiana remains continuous. Thus, United argues the break or interruption in the actual movement of the gas does not remove the immunity from state property taxation provided by the commerce clause.
We are of the opinion that the storage of the working gas in Bienville Parish pending its ultimate withdrawal and delivery to out-of-state consumers is based on an economic decision of United necessitated by the character of its business. United was not required by any governmental agency to construct the Project. The curtailment program of the FERC designates priority consumers among which United must allocate available supplies of natural gas. As pointed out by the defendant-tax collector, there is no government requirement that United locate more gas if it is unable to meet the demands of these priority customers. The FERC curtailment program is not designed to regulate the movement of the gas in interstate commerce, but rather to allocate the available gas to certain priority consumers. United continues to operate the Project as it did at the inception of its operation, i. e., it purchases gas during periods of slack demand and stores it until the demand is higher and the market will absorb the gas. The storage of this gas pending winter demand is an economically expedient method of assuring United the greatest amount of sales. The commerce clause of the United States Constitution does not prohibit the taxing of this gas in storage.
LOUISIANA EXEMPTION FOR PROPERTY IN TRANSIT
United contends that La.Const. Art. VII, § 21(D)(3) provides an exemption from ad valorem taxation to the working gas in this case even if it would enjoy no such immunity under the commerce clause of the Federal Constitution. This Louisiana Constitutional provision exempts from taxation:

*918 Goods, commodities, and personal property in public or private storage while in transit through this state which are moving in interstate commerce through or over the territory of the state or which are in public or private storage within Louisiana, having been shipped from outside Louisiana for storage in transit to a final destination outside Louisiana, whether such destination was specified when transportation began or afterward.
(This constitutional provision is effectuated by its statutory counterpart, La.R.S. 47:1951.3.) According to United's interpretation of this section, it provides two distinct exemptions: (1) the first applicable to property in transit in interstate commerce, and (2) the second applicable to property shipped from outside Louisiana, stored in public and private facilities with a final destination outside Louisiana. United contends that this "second exemption" does not require that the property be in transit in interstate commerce. This identical argument was made by the plaintiff-taxpayer in Enterprise Products Co. v. Whitman, supra, and was rejected by this court. We adhere to our opinion in Enterprise that Art. VII, § 21(D)(3) is essentially a codification of federal law as it existed at the time of the enactment of the predecessor provision to Art. VII, § 21(D)(3), and for the reasons previously discussed, the working gas at issue here is not exempt under this Louisiana provision.
LOUISIANA SEVERANCE TAX
The gas stored in the Project upon which the ad valorem taxes at issue were levied consisted of a small percentage of gas which had been produced in Louisiana and upon which Louisiana severance tax had been paid (2.67% of the working gas during tax year 1977, and 19.75% of the cushion gas for both years at issue). The constitutional provision which authorizes the Louisiana Legislature to levy taxes on natural resources severed from the soil or water is La.Const. Art. VII, § 4(B) which reads in part as follows:
(B) Severance Tax. Taxes may be levied on natural resources severed from the soil or water, to be paid proportionately by the owners thereof at the time of severance. Natural resources may be classified for the purpose of taxation. Such taxes may be predicated upon either the quantity or value of the products at the time and place of severance. No further or additional tax or license shall be levied or imposed upon oil, gas, or sulphur leases or rights. No additional value shall be added to the assessment of land by reason of the presence of oil, gas, or sulphur therein or their production therefrom.... [emphasis added]
United contends that since severance tax has already been paid on this natural gas, the ad valorem taxes levied by the defendant-tax collector are in contravention of the above quoted provision. This argument is without merit. Severance taxes are excise taxes upon the privilege or right to sever natural resources from the soil and are paid by the owner of the resource at the time it is produced. See La.R.S. 47:631, et seq. The prohibition in La.Const. Art. VII, § 4(B) against additional taxes is aimed at preventing the natural resource from being taxed while in place. If natural resources in the ground could be valued and assessed for property tax purposes, the owner would pay this tax in addition to the severance tax he pays upon producing the minerals. The prohibition in Art. VII, § 4(B) is aimed at preventing such multiple taxation. However, once the natural gas upon which severance tax has been paid is purchased by a third party and placed in storage in this state, it becomes subject to ad valorem property tax the same as any other property.
ATTORNEY FEES
These suits were brought by United under La.R.S. 47:2110 attacking the legality of the ad valorem taxes on the gas in storage in Bienville Parish and seeking recovery of the taxes paid under protest. There is no provision in this statute requiring payment of attorney fees for the tax collector by the unsuccessful taxpayer. The defendant-tax collector contends he is entitled to recover his attorney fees under La.R.S. 47:1998, the *919 statute prescribing a procedure for judicial review of assessments. Section 1998 provides that the attorney who represents the tax collector in all proceedings for the reduction of assessments and collection of taxes shall receive a compensation of 10% of the amount collected. United contends that this is not a suit challenging the correctness of an assessment nor one for the collection of taxes, but rather a proceeding brought by a taxpayer who has timely paid his taxes and now seeks by the machinery provided by law to challenge the validity of the tax. The trial court was of the opinion that a losing taxpayer in a payment under protest suit such as this must pay the attorney fees in light of the Supreme Court's decision in South Central Bell Telephone Co. v. Traigle, 367 So.2d 1143 (La.1978), rehearing denied 1979. The Bell Telephone case was concerned with a suit for the recovery of transportation and communication utilities taxes paid under protest pursuant to La.R.S. 47:1576. The taxpayer in Bell Telephone lost the suit, and in response to its argument that attorney fees were not awardable in the payment under protest suit, the Supreme Court held that in effect this was a suit for the collection of taxes. Since the monies paid under protest are held in escrow and the state is deprived of the use of this money, the Supreme Court concluded that the collection of the taxes was not complete until a final judgment denying the taxpayer's prayer for the return of taxes paid under protest.
The plaintiff-taxpayer in the Bell Telephone case was seeking recovery of taxes which were already delinquent when paid under protest. The taxpayer had failed to timely report and remit the taxes which were due. Also at issue in that case were taxes which had become due after the initiation of the proceeding and which had been timely reported and paid under protest. The collector was only awarded as attorney fees 10% of the taxes which were already delinquent when paid under protest. As the majority opinion in Bell Telephone seemed to hold that the losing taxpayer was to be assessed 10% of all taxes paid under protest, the defendant-tax collector sought to have the amount awarded as attorney fees amended to include 10% of the taxes which had been timely reported and paid under protest during the pendency of the litigation. This application for rehearing was denied.
This court has recently faced this issue under circumstances analogous to those presented here. See Enterprise Products, supra. Enterprise dealt with ad valorem taxes timely paid under protest pursuant to La.R.S. 47:2110, the same statute at issue in the instant litigation. In response to a reconventional demand for attorney fees pursuant to La.R.S. 47:1998, we held in Enterprise that attorney fees should not be imposed against a taxpayer where the tax being contested had been timely paid under La.R.S. 47:2110. We held that § 1998 contemplated collection of taxes and penalties not previously paid, and § 2110 contemplated litigation over taxes previously paid and on which no penalties were due.
The taxes assessed and levied on United in this suit were timely paid under protest as were the portion of taxes in the Bell Telephone case upon which attorney fees were not awarded. Justice Dennis pointed out in his concurring opinion on the denial of rehearing in Bell Telephone that there is a distinction between taxes which are delinquent when paid under protest and those which are timely paid under protest. It is reasonable for a taxpayer who delinquently pays taxes under protest to be assessed attorney fees as a penalty in the event his challenge is found invalid. On the other hand, a taxpayer who timely pays his taxes and then seeks recovery should not be assessed for the tax collector's attorney fees simply because he is the losing party. Such a rule would place an unreasonable penalty on a taxpayer's right to challenge the validity of a tax and is less than the complete and adequate remedy mandated by La. Const. Art. VII, § 3.[1] Therefore we feel *920 that the award of attorney fees in this case is not appropriate.
For the foregoing reasons, the judgment awarding defendant attorney fees of 10% of the amount of taxes paid under protest is reversed, and his demands in reconvention against United are denied; the judgment rejecting United's demands for recovery of ad valorem taxes paid under protest for the years of 1977 and 1978 is affirmed at appellant's cost.
NOTES
[1] Section 3. The legislature shall prohibit the issuance of process to restrain the collection of any tax. It shall provide a complete and adequate remedy for the prompt recovery of an illegal tax paid by a taxpayer.